# UNITED STATES DISTRICT COURT
for the
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16-cr-00257-JWS-TAB-1 |
| | ) | |
| JOSHUA SHANE DUFFY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT JOSHUA DUFFY SENTENCING MEMORANDUM**

"Success is not final, failure is not fatal: it is the courage to continue that counts," Winston S. Churchill. Joshua Duffy seeks a fair sentence that is consistent with the factors of 18 U.S.C. § 3553. Mr. Duffy accepted responsibility and pled guilty timely.

**I.**             **The Charges**

**Count 1**:
Sexual Exploitation of a Child, 18 U.S.C. § 2251(a)
15 to 30 years imprisonment/$250,000 fine/NLT 5 years TSR (Class A Felony)

**Count 4**:
Coercion and Enticement, 18 U.S.C. § 2422(b)
10 years to life imprisonment/$250,000 fine/NLT 5 years TSR (Class A Felony)

## II. Applying the factors of 18 U.S.C. § 3553 (a) to Joshua Duffy

A. **The Nature and Circumstances of the Offense**

Joshua admits to being sexually involved with both minor girls. He met both girls while surfing the internet on dating application websites.

Duffy met Minor Victim 1 ("MV1") using a dating application over the internet. They met and engaged in sexually explicit conduct. Duffy requested MV1 send videos of the sexual acts they engaged together and provided an email address. She sent the video using multiple attachments. MV1 was 15 years of age at the time of the sexual encounter.

Duffy met Minor Victim 2 ("MV2") using the internet via an application named "Whisper." From this meeting, Duffy and MV2 engaged in sexual acts on at least two occasions. MV2 was 14 years old and a freshman in high school at the time of the sexual acts. Duffy requested MV2 send him videos of her masturbating via the internet, and she complied.

The internet represented an opportunity for people to meet and communicate in a non-threatening manner. Users are able to hide behind an electronic device where it is difficult to determine a person's age, or physical description. Duffy, had reason to believe that both young women were not minors upon initial contact. After meeting both girls and having ample time to observe each girl, it was clear they were not adults. Duffy deeply regrets not exercising better judgment. He should have walked away and ceased to communicate with both girls once he had the opportunity observe and interact with each girl.

2

B. **Joshua's History and Characteristics**

    1. **Joshua's childhood and background**

The Probation department gathered information regarding my client that is included in this section.

Joshua Shane Duffy was born to the union of Darren Duffy and Tina McCarty on March 23, 1986, in Jacksonville, Florida. His father, age 56, is an over-the-road truck driver who lives in Upland, Indiana. His mother, age 56, is retired from the United States Army and lives in Orange Park, Florida. She suffers from sciatic nerve damage and is disabled.

Mr. Duffy has four half-siblings. Maternal half-brother James Roberts, III, age 36, lives in Jacksonville, Florida. The defendant was unsure of his employment. Paternal half-sister Heather Duffy, age 36, lives in Montana and works at Walmart. She was described as a drug addict, and the defendant has little contact with her. Paternal half-sisters Tessa Mozden, age 21, and Marcella Mozden, age 19, live in Upland, Indiana. Both work at restaurants. Mr. Duffy is close to his half-brother and younger half-sisters.

The Duffy's parents divorced when he was around two years old, and he was raised primarily by his mother. Tina McCarty was described as somewhat needy woman who always had to be in a romantic relationship. She has been married five times, and three times since divorcing the defendant's father. She was often depressed and once attempted suicide. Mr. Duffy described her as a loving mother who did her best to raise two boys. She has always supported him, and she encouraged him to do his best. They share a very good relationship.

Darren Duffy, his father spent much of the defendant's childhood running from law. After sorting out his legal situation, he reached out to the defendant while the defendant was a teenager, and they have since formed a good relationship. He was described as a good man who has taught the defendant to persevere and not become depressed when things do not work out for him. He has also taught the defendant how to be a father. They are very close. Transience was not the only aggravating factor in the defendant's childhood. One of his step-fathers was an alcoholic who became violent when drunk. His mother was at times emotionally unstable. Additionally, he was physically and verbally abused by a boyfriend of his mother's several times per week for around one year when he was ten or 11 years old. The abuse never happened in front of his mother. While he was younger, Mr. Duffy enjoyed playing sports, including soccer, football, and basketball.

Mr. Duffy has never married or fathered any children. He has been involved in an "off and on relationship" with Angela Ingram for 17 years. Most recently, they have been together for the last two and a half years, and the defendant indicated they are engaged. Ms. Ingram, age 30, lives in Wilkinson, Indiana, and is a manager at Hardees. She was described as "wonderful, kind-hearted, loving, and devoted." She has always been supportive of the defendant and told him she intends to continue their relationship. They are very close and speak daily.

Angela Ingram has one daughter from a prior relationship. Kylia Whaley, age 12, lives with her and is the 6th grade. The defendant has helped raise Kylia and considers her to be

his daughter. He described her a "very smart, outgoing" and "an amazing little girl." She is also determined and driven.

Mr. Duffy moved from Florida to Indiana in October 2013 to be close to his father. Since that time, he has lived mostly in Huntington and Upland. At the time of his arrest in the instant offense, he had lived alone at 468 E. Washington Street, Lot D3, in Upland for six months. He was purchasing the mobile home for $450.00 per month. Prior to this, he lived with his father at Lot D5 in the same mobile home park for one year. Before this, he lived with an ex-girlfriend in Huntington for about one year.

Darrin Duffy said Joshua experienced a misguided childhood, during which his mother and her various partners were poor examples for him. In his own words, more or less, the defendant was not afforded a childhood and was forced to grow up too fast. He went on to say that had the defendant been able to live with him, he believes his life would have turned out much differently. The elder Mr. Duffy advised the defendant had made strides toward getting his life together in the years leading up to his arrest in the instant offense; however, his efforts were undone by a couple of bad decisions. Darrin Duffy remains very supportive of the defendant and described him as "personable" and "intelligent." He is well liked by everyone, and he is quick to help others. He believes the punishment awaiting the defendant is disproportionate to the crime, and he is "sick to (his) stomach" that he may not live to see the defendant released from prison. He is also concerned that the defendant will have no support system when that day arrives. He closed his conversation with this officer by stating the defendant "is not a monster; he's just mixed up."

5

Mr. Duffy experienced a very unstable childhood. The abuse at the hands of his stepfathers negatively impacted him. He never received any treatment or counseling related specifically to the abuse suffered at the hands of his stepfathers. Additionally, His stints in prisons left him battered and bruised as well. He suffered extensive unimaginable abuse from other prisoners at multiple prisons. Duffy will explain plainly in his statement to the Court the extent of the abuse he suffered while in prison.

Joshua Duffy has no prior charged or uncharged conduct harming minors.

**The need for the sentence imposed:**

**(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

In considering an adequate sentence imposed on my client, the Court should start by looking at the applicable guideline calculation and its corresponding penalty range for the crime. In this case, his guideline calculation range has an adjusted offense level of 42 and a criminal history category of VI. Therefore, his guideline imprisonment range is 360 months to life.

The Parties negotiated a Plea Agreement that has a penalty range of 240 to 300 months. A sentence of 20 years reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for these offenses. This offense has 3 days of charged conduct and we are asking this Court to view the 7,300 days (20 years) of incarceration as adequate to repay his debt to society. Mr. Duffy deeply regrets his actions and knows that his actions should

be punished. We suggest the lower end of the range at 240 months or 20 years as an adequate way of showing respect for the law, and providing just punishment for his offenses.

## (B) to afford adequate deterrence to criminal conduct;

Prior to the charged conduct, Joshua had no previous criminal conduct toward minors. A sentence of 20 years for Joshua without any history of crimes against minors, or sex crimes would seem adequate. A sentence at the low end of the range would be adequate to remind Joshua and others that this type of behavior is both hurtful and harmful to the community. He understands that society must be protected from anti-social behaviors. The action of engaging in sexually explicit activity while capturing the moment electronically scars the minors for the remainder of their lives. Provided he received a sentence of 20 years he understands that a generation will pass and he was be on his way toward elder status once he completes serving his sentence of imprisonment. A sentence of 20 years would send a loud message to anyone who would consider engaging in that kind of conduct. A sentence of that length will serve as adequate deterrence from criminal conduct of similarly situated people within the community.

## (C) to protect the public from further crimes of the defendant; and

A sentence of 240 months would mean Joshua would almost be the age of 50 years once he is released from federal custody. While incarcerated he would have a substantial time for rehabilitation. Statistics and data analysis support sentences that gets him past age 29 and into a different group of people who are likely to recidivate. Researchers have consistently found that age is one of the most significant predictors of criminality, with criminal or delinquent activity

peaking in late adolescence or early adulthood and decreasing as the person ages.[1] Older offenders are less likely to commit additional crimes after their release than younger offenders.[2] Studies of parole violations also decreases with age, with older parolees the least likely group to be re-incarcerated.[3] A 1998 study found that only 3.2% of offenders 55 and older returned to prison within a year or release compared with 45 percent of offenders 18 to 29 years old.[4] A 2004 analysis of people sentenced under federal sentencing guidelines found that within two years of release the recidivism rate among offender older than 50 was only 9.5% compared with a rate of 35.5% among offenders younger than 21.[5]

---

[1] Tina Chiu, It's About Time – Aging Prisoners, Increasing Costs, and Geriatric Release, Center on Sentencing and Correction, April 2010 at p. 5

[2] Darrell J. Steffenmesier et al, Age and the Distribution of Crime American Journal of Sociology, 94(4), 803-831 (1989).

[3] Brie Williams and Rita Abradles, "Growing Older: Challenges of Prison and Reetnry for the Aging Population," in *Public Health Behind Bars: From Prisons to Communities*, edited DesmondB. Greifinger (New York, NY: Springer 2007).

[4] Barry Holman, Nusing Homes Behind Bars: The Elderly in Prison" *Coalition for Federal Sentencing Reform*, 2(1), 1-2 (1998). See also Robyn L. Cohen *Probation and Parole Violators in State Prison*, 1991 (Washington, DC: Bureau of Justice Statistics, 1995).

[5] United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004).

8

Mr. Duffy was diagnosed with attention deficit hyperactivity disorder (ADHD) and bipolar disorder at age 7. He was prescribed Ritalin. He took the Ritalin for two years before he began throwing himself down stairs. His prescription was then changed to Adderall and Wellbutrin, which he took until age 16. In the meantime, at age 12, he was also diagnosed with severe depression. Mr. Duffy stopped taking all medication at age 16 because he did not like the way it made him feel. He has not taken any medication since 2002, and he has not seen a psychiatrist since shortly before his release from prison in 2009.

Mr. Duffy acknowledged he should have treated his mental health issues more consistently and he opined that he likely would not be in current legal predicament had he done so. He expressed a desire for a mental health evaluation while he is incarcerated, and an intent to participate in any recommended treatment. In his own words, "I know I have problems with bipolar and depression, and not treating them hasn't helped."

Darrin Duffy believes the defendant is in good mental health but volunteered that he lacks common sense and makes poor decisions at times. He will have 20 years to sort through what medication actually works and society will be protected from any of his future conduct until he is released.

### 2. Education and Employment

Mr. Duffy graduated from Charlotte High School in Punta Gorda, Florida, in 2005. Probation noted the records manager for the Charlotte County Public Schools, Adam Cornett, was unable to find any record of his enrollment or attendance. Between 2010 and 2012, he

reportedly studied psychology and criminal justice at the University of Phoenix, both online and at the school's Jacksonville North campus in Florida. He withdrew after separating from his girlfriend, returning to Orange Park, and losing reliable transportation. A request for records from the University of Phoenix is pending.

Between February 15, 2016, and November 3, 2016, Mr. Duffy was employed as a stocker and picker at American Woodmark Corporation, a custom cabinet manufacturer in Gas City, Indiana. Records from the employer indicate he earned $12.10 per hour and was terminated due to "attendance." Between 2013 and February 14, 2015, the defendant said he was employed by Pro Resources Staffing Services, a temporary employment agency in Huntington, Indiana. The agency sent him to a variety of part time jobs, and he advised that he was never without work.

In 2011 and 2012, the defendant worked at WPC Industrial Contractors, LLC, in Jacksonville as a pipefitter.

The defendant's employment prior to 2011 was spotty and mostly short-lived.

**2. To Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes**

A sentence of 240 months would place Joshua close to 50 years of age. He would have a substantial amount of time for rehabilitation. Statistics and data analysis support sentence that gets him past age 29 and into a different group of people who are likely to recidivate. Researchers have consistently found that age is one of the most significant predictors of

criminality, with criminal or delinquent activity peaking in late adolescence or early adulthood and decreasing as the person ages.[6] Older offenders are less likely to commit additional crimes after their release than younger offenders.[7] Studies of parole violations also decreases with age, with older parolees the least likely group to be re-incarcerated.[8] A 1998 study found that only 3.2% of offenders 55 and older returned to prison within a year or release compared with 45 percent of offenders 18 to 29 years old.[9] A 2004 analysis of people sentenced under federal sentencing guidelines found that within two years of release the recidivism rate among offender older than 50 was only 9.5% compared with a rate of 35.5% among offenders younger than 21. [10]

It is also important to note how expensive it is to imprison a person with so many medical issues that are better addressed by doctors within the community. When Comparing younger healthy peers, older inmates have higher rates of both mild and serious health conditions, such as

---

[6] Tina Chiu, It's About Time – Aging Prisoners, Increasing Costs, and Geriatric Release, Center on Sentencing and Correction, April 2010 at p. 5

[7] Darrell J. Steffenmesier et al, Age and the Distribution of Crime American Journal of Sociology, 94(4), 803-831 (1989).

[8] Brie Williams and Rita Abradles, "Growing Older: Challenges of Prison and Reetnry for the Aging Population," in *Public Health Behind Bars: From Prisons to Communities*, edited DesmondB. Greifinger (New York, NY: Springer 2007).

[9] Barry Holman, Nusing Homes Behind Bars: The Elderly in Prison" *Coalition for Federal Sentencing Reform*, 2(1), 1-2 (1998). See also Robyn L. Cohen *Probation and Parole Violators in State Prison*, 1991 (Washington, DC: Bureau of Justice Statistics, 1995).

[10] United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004).

gross functional disabilities and impaired movement, mental illness, increased risk of major diseases, and a heightened need for assistance with daily living activities.[11] Hearing loss, vision problems, arthritis, hypertension, and dementia are all more common among older inmates. Consequently, according to a 2004 report from the National Institute of Corrections, the annual cost to imprison an older person was an estimated $72,000 compared to $24,000 to house a younger prisoner.[12] Significantly, these cost numbers are over a decade old and healthcare costs increase faster than inflation making the actual cost at the time that Joshua will have served substantially higher. The low risk of Joshua committing another crime when he is released at or near age 50 combined with the high cost of incarceration support giving Joshua low end of the sentencing range.

**3.      To Provide Joshua with the Needed Education and Vocational Training, and other Correctional Treatment in the Most Effective Manner.**

If the Court sentences Joshua to a sentence of 20 years, then he will have the opportunity to get the needed educational and vocational training, mental health care, and other correctional treatment needed to prepare Joshua for rehabilitation and maintenance upon release.

Joshua acknowledges the seriousness of the offense for which he is pleading guilty. He intends to take advantage of every learning and growing opportunity that he will be provided

---

[11] Tina Chiu, It's About Time – Aging Prisoners, Increaseing Costs, and Geriatric Release, Center on Sentencing and Correction, April 2010 at p. 5

[12] B. jaye Anno et al., *Correctional Health Care: Addressing the Needs of the Elderly, Chronically Ill, and Terminally Ill Inmates* (Washington, DC: U.S. Department of Justice, National Institute of Corrections, 2004).

while imprisoned. It is important to note that if provided adequate educational and vocational training, inmates are less likely to recidivate upon release. If he is provided an opportunity to learn proper vocational and social techniques, Joshua will be less likely to recidivate.

In his article *Educated Prisoners are Less Likely to Return to Prison*, James S. Vacca suggests that, "prisoners who attend education programs while in prison are less likely to return upon release." James S. Vacca, *Educated Prisoners are Less Likely to Return to Prison*, Vol. 55, No. 4 The Journal of Correctional Education, 297 (2004), available at <http://www.jstor.org/stable/23292095>. While the academic aspect of the educational programs is important, the key is added education that must include social and vocational training. Vacca states that "[e]ffective education programs are those that help prisoners with their social skills, artistic development and techniques, and strategies to help them deal with their emotions…[t]he inmates who participate in these programs do so because they see clear opportunities to improve their capabilities for employment after being released." *Id*. Joshua never completed higher education. This time incarcerated will given him time to advance his education and gain a much needed skill to be functional upon release.

**III. Conclusion**

Joshua is before this Court because he has never gotten the proper treatment and counseling he needs to recover from the trauma he faced throughout his life. His dysfunctional criminal behavior is directly connected to his abuse he has suffered first as a child and then as an adult while in prison. Joshua Duffy is another young person making irrational decisions. He cannot see the disconnect for many reasons, starting with his mental health issues that have never

been addressed. When you start behind, never get adequately treated for your mental health issues, and never get properly medicated, you get this result.

This arrest and conviction marks an opportunity for him to slow down, get the proper mental health treatment and start a solid path for a bright future. We do not know his potential, or untapped skills because he's spent his entire life in and out of custody.

After consideration of all of these factors, Joshua asks the Court to consider a sentence that is long enough to get him the help he needs. A sentence that is sufficient, but not greater than necessary to comply with the purposes set for in 18 USC § 3553, and a sentence to the minimum in the agreed range in the Plea Agreement of 240 months.

Respectfully submitted,

___/s/_Kenneth L Riggins_
Kenneth L. Riggins #21384-49
1512 North Delaware Street
Indianapolis, Indiana 46202
Telephone: (317) 413-5931
Computer: Kennethriggins@yahoo.com

**Certificate of Service**

I hereby certify that a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

__/s/_Kenneth L Riggins_
Kenneth L. Riggins