```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
 2                 INDIANAPOLIS DIVISION

 3
     UNITED STATES OF AMERICA,    )
 4                                )
                                  ) CAUSE NO.
 5          Plaintiff,            ) 1:16-cr-00257-JRS-TAB
                                  )
 6          -vs-                  )
                                  ) Indianapolis, Indiana
 7   JOSHUA SHANE DUFFY,          ) February 19, 2019
                                  ) 1:30 p.m.
 8          Defendant.            )

 9

10                      BEFORE THE
                 HONORABLE JAMES R. SWEENEY

11

12           OFFICIAL REPORTER'S TRANSCRIPT OF

13                  SENTENCING HEARING

14

15   FOR THE PLAINTIFF:         Ms. Tiffany Preston
                                Assistant United States Attorney
16                              10 West Market Street
                                Suite 2100
17                              Indianapolis, IN  46204

18   FOR THE DEFENDANT:         Mr. Kenneth L. Riggins
                                ATTORNEY AT LAW
19                              1512 Delaware Street
                                Indianapolis, IN  46202
20

21

22   Court Reporter:    Cathy Easley Jones, RDR, FCRR
                         Official Court Reporter
23                       46 East Ohio Street, Room 290
                         Indianapolis, IN  46204
24

25          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
               COMPUTER-AIDED TRANSCRIPTION
```

1    *(In open court)*

2         **THE COURT:**   Please be seated.

3         We are on the record in United States of America

4    versus Joshua Shane Duffy, Cause 16-cr-257.

5         And Mr. Duffy has been adjudged guilty of Counts 1

6    and 4 of the indictment of sexual exploitation of a child, in

7    violation of 18 USC Section 2251(a), and coercion and

8    enticement, in violation of 18 USC Section 2422(b),

9    respectively; and we're here today for the sentencing.

10        And, Mr. Riggins, will you introduce yourself and

11   your defendant -- or your client, please?

12        **MR. RIGGINS:**   Your Honor, my name is Kenneth

13   Riggins.  I am representing Joshua Shane Duffy today.

14        **THE COURT:**   Okay.

15        **MR. RIGGINS:**   With us also today is his mother and

16   his father, his fiancée and his goddaughter, along with some

17   other friends and family.

18        **THE COURT:**   All right.  Welcome, Mr. Riggins.

19   Welcome, Mr. Duffy and family.

20        And for the government?

21        **MS. PRESTON:**   Good afternoon, Your Honor.  Tiffany

22   Preston on behalf of the United States.  With me today is the

23   case agent, Task Force Officer Darin Odier of the FBI.

24        In addition to that, Your Honor, the family members

25   of Minor Victim 1 and Minor Victim 2 are in the second-to-last

1  row in the back facing Your Honor.

2          **THE COURT:**  Okay.  Welcome, Ms. Preston, Mr. Odier

3  and family.

4          And for probation?

5          **MR. RENSHAW:**  Good afternoon.  Matt Renshaw for

6  probation, Your Honor.

7          **THE COURT:**  Mr. Renshaw, welcome.

8          And so we have victims' family.

9          Any of the victims here, minor victims?

10         **MS. PRESTON:**  No, Your Honor, the minor victims are

11  not here.  Their mothers, fathers, and stepdad are here today,

12  Your Honor.

13         **THE COURT:**  Okay.  All right.  Thank you.

14         So the Court has reviewed the revised final

15  presentence report, the PSR with addendum, filed at ECF 77;

16  the defendant's sentencing memo, filed at ECF 79; the victim

17  impact statement, filed at ECF 80-1 and 80-2 -- so that's 80-1

18  and 80-2 -- including letters from Minor Victim 1's parents

19  and text messages between Minor Victim 1 and Mr. Duffy.  I

20  have not received any other sentencing documents or letters.

21         Is there anything for the Court today?  Anything

22  further today?

23         **MR. RIGGINS:**  Just only by way of proffering

24  information, Your Honor.

25         **THE COURT:**  Okay.  But no other documents?

1          **MR. RIGGINS:**  No other documents.

2          **THE COURT:**  Okay.  All right.

3          All right.  Mr. Riggins, have you and Mr. Duffy read

4    and discussed -- well, let me back up.

5          Mr. Duffy, just for your benefit, what we're going

6    to do here today is we are going to talk about this PSR, the

7    presentence report; and then we're going to talk about the

8    agreement between you and the government with respect to

9    potential penalties.  We're going to go over the guideline

10   calculations as determined by the Court and as well as the

11   criminal history category and then see if there's any

12   objections to those, and then we will proceed to statements

13   and then sentencing.

14         Do you understand all that, Mr. Duffy?

15         **THE DEFENDANT:**  Yes, sir.

16         **THE COURT:**  Okay.  All right.  So Mr. Riggins, have

17   you and Mr. Duffy had an opportunity to read the presentence

18   report?

19         **MR. RIGGINS:**  Yes, Your Honor, we have.

20         **THE COURT:**  And you were -- were you afforded the

21   opportunity to provide information for the PSR?

22         **MR. RIGGINS:**  Yes, Your Honor, we were.

23         **THE COURT:**  And you don't have any objections.  None

24   were filed.

25         Do you have any objections today to the PSR?

1          **MR. RIGGINS:**  We have no objections, Your Honor.
2    There were some corrections --

3          **THE COURT:**  Okay.

4          **MR. RIGGINS:**  -- with names and spellings and things
5    of that nature, pretty minor in nature, that Mr. Duffy later
6    pointed out.

7          **THE COURT:**  Had those been -- are those still
8    reflected in the PSR or those have been corrected and --

9          **MR. RIGGINS:**  They are still reflected in the PSR.

10          **THE COURT:**  Okay.  Are those things that we need to
11    handle or are those immaterial?

12          **MR. RIGGINS:**  I believe they're immaterial to what
13    we're doing today.  We could probably clear them up, as a
14    matter --

15          **THE COURT:**  Why don't you go ahead.

16          **MR. RIGGINS:**  For example, his father's first name
17    is spelled D-A-R-R --

18          **THE COURT:**  Where are we, what paragraph?

19       *(Discussion held off the record.)*

20          **THE COURT:**  Darren Duffy?

21       *(Discussion held off the record.)*

22          **MR. RIGGINS:**  Your Honor, he says it's been
23    corrected.

24          **THE COURT:**  So that's -- D-A-R-R-E-N is correct?

25          **MR. RIGGINS:**  That is correct.

1     **THE COURT:** Okay. What else?

2     *(Discussion held off the record.)*

3     **THE COURT:** Okay. I see, in paragraph 101, it's

4  spelled D-A-R-R-I-N. Is that incorrect?

5     **MR. RIGGINS:** That is incorrect, Your Honor.

6     **THE COURT:** All right. So at least at paragraph 101

7  and anyplace else that it appears as D-A-R-R-I-N, we will

8  interlineate that to be D-A-R-R-E-N.

9     It looks like paragraph 91, as well?

10     **MR. RIGGINS:** That was in paragraph 93, you said,

11  Your Honor?

12     **THE COURT:** Ninety-one and 94 and 97.

13     **MR. RIGGINS:** Yes, Your Honor.

14     **THE COURT:** And those are at least apparent

15  immediately.

16     **MR. RIGGINS:** Your Honor, as it relates to the

17  educational and vocational --

18     **THE COURT:** At what paragraph?

19     **MR. RIGGINS:** I have it listed originally on 101.

20  It is now 102.

21     **THE COURT:** Uh-huh.

22     **MR. RIGGINS:** The "Charlotte High School" should

23  read "Charlotte Correctional Institute."

24     **THE COURT:** So "high school" is not a part of it at

25  all?

1        **MR. RIGGINS:**  He said it was just -- that's correct.

2        **THE COURT:**  Charlotte Correctional Institute?

3        **MR. RIGGINS:**  Yes, that's where he got his high

4 school diploma.

5        **THE COURT:**  In Punta Gorda?

6        **MR. RIGGINS:**  Yes.

7        **THE COURT:**  No objection there, Ms. Preston?

8        **MS. PRESTON:**  No, Your Honor.

9        **THE COURT:**  Okay.

10        **MR. RIGGINS:**  Paragraph 104, I believe it is, he

11 indicated that, instead of saying February 15th, 2016, it

12 should read February 15th, 2015.

13        **THE COURT:**  Any objection?

14        **MS. PRESTON:**  No, Your Honor.  Sorry.  No.

15        **THE COURT:**  Mr. Renshaw?

16        **MR. RENSHAW:**  That date is from records the employer

17 provided, Your Honor.

18        **THE COURT:**  Which, 2015 or 2016?

19        **MR. RENSHAW:**  2016.  Those are the dates they

20 provided.

21        **THE COURT:**  All right.  Mr. Duffy, why do you think

22 it's 2016?  Your employer seems to think it was -- excuse me.

23 Why do you think it's 2015?  The employer seems to think it's

24 2016.

25        **THE DEFENDANT:**  Okay.  That's when I started, in

1   2015; but I was on the probationary period during 2015.  And

2   then after the 90 days, I was hired full-time staffing.

3       **THE COURT:**  All right.  I think we're going to rely

4   on the employer.  And it's immaterial.  It's not going to

5   affect anything that happens here today, so that will not be

6   changed.

7       Okay.  Anything else?

8       **MR. RIGGINS:**  I think there's one last thing -- two

9   last things, Your Honor.

10      The paragraphs have changed since he sent me these

11  notes.

12      **THE COURT:**  Yeah, sure.

13      **MR. RIGGINS:**  Your Honor, he's going to cover the

14  rest of it in his letter to the Court, his statement to the

15  Court.

16      **THE COURT:**  Okay.  All right.  Anything from the

17  government?

18      **MS. PRESTON:**  Only one word, Your Honor.  In

19  paragraph 12, the last line of paragraph 12, it says,

20  "including oral and vaginal intercourse as it relates to Minor

21  Victim 1."  It should say, "including oral and anal

22  intercourse."

23      **THE COURT:**  Okay.  Any objection?

24      **MR. RIGGINS:**  No objection, Your Honor.

25      **THE COURT:**  So that will be interlineated in

1  paragraph 12.

2          **MS. PRESTON:**  Thank you, Your Honor.  Nothing

3  further.

4          **THE COURT:**  Okay.  All right.  Now, with respect to

5  the proposed conditions of supervised release found in the

6  PSR, have you reviewed those carefully with Mr. Duffy,

7  Mr. Riggins?

8          **MR. RIGGINS:**  Yes, he has, Your Honor; and I've gone

9  over them with him.

10          **THE COURT:**  Any objections?

11          **MR. RIGGINS:**  No objections to them.

12          **THE COURT:**  All right.  Mr. Duffy, have you reviewed

13  those proposed conditions as --

14          **THE DEFENDANT:**  Yes.

15          **THE COURT:**  Okay.  And the probation officer has

16  included the reasons why he's recommending the conditions, and

17  I agree with those reasons.

18          Do you understand them?

19          **THE DEFENDANT:**  Yes, sir.

20          **THE COURT:**  Okay.  By the way, at this point, why

21  don't you and Mr. Riggins come up here to the lectern.

22          So, you have the right to have me read each of the

23  conditions to you as I propose sentence; or if you believe you

24  understand them and why they're being imposed, you can waive

25  the right.

1  Would you like for me to read the conditions when I

2  pronounce sentence or do you waive reading?

3  **THE DEFENDANT:**  I waive reading.

4  **THE COURT:**  All right.  I find that Mr. Duffy has

5  waived formal reading, and I accept that waiver; and the Court

6  further accepts the presentence report as its findings of fact

7  as just interlineated and accepts the presentence report for

8  the record under seal.

9  In the event of any appeal, counsel on appeal will

10  have access to the sealed report but not to the recommendation

11  portion, which shall remain confidential.

12  Now, the plea agreement itself is governed by

13  Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure,

14  which means that the government and Mr. Duffy have agreed that

15  a specific sentence set forth in the plea agreement is the

16  appropriate disposition of the case; and the agreement is

17  binding on the Court, if the Court accepts the plea agreement,

18  which the Court has.

19  Specifically, the parties have agreed to the

20  Court -- that the Court should sentence Mr. Duffy to a term of

21  imprisonment for a period of 20 -- or between 20 and 25 years.

22  Further, the parties understand and agree that a term of

23  supervised release of at least 60 months, which is five years,

24  and up to the life of Mr. Duffy is required.  And these are

25  the only terms of the plea agreement subject to Rule

1  11(c)(1)(C)'s provision; in other words, the only provisions

2  that the Court has to either accept or reject.

3        And the Court does accept the agreed sentence, which

4  is this range between 20 years and 25 years, and accepts the

5  plea agreement.

6        The plea agreement contemplates that the government

7  would move for an additional one-level reduction under

8  sentencing guideline Section 3E1.1B for acceptance of

9  responsibility.

10        Does the government now make such a motion?

11        **MS. PRESTON:** We do, Your Honor.

12        **THE COURT:** All right. That is approved -- or

13  granted.

14        And the following, then, are the Court's conclusions

15  as to the appropriate offense level and criminal history

16  category: For group 1, Count 1, and group 2, Count 2, the

17  base offense level is 32 under sentencing guideline Section

18  2G2.1(a). Two levels are added under sentencing guideline

19  Section 2G2.1(b)(1)(B) because the victim was a minor between

20  the age of 12 and 16. Two levels are added under sentencing

21  guideline Section 2G2.1(b)(2)(A) because the offense involved

22  the commission of a sexual act. And two levels are added

23  under guideline Section 2G2.1(b)(6)(B)(ii) because the

24  defendant used a computer or interactive computer service to

25  persuade, induce, entice, or solicit participation by the

minor victims in sexually explicit conduct.  So the adjusted offense level for each count is 38.

Under sentencing guideline Section 3D1.4, one unit is assigned to each group, resulting in a total number of two units, and the adjusted offense level of 38 is increased by two, therefore, which is the number of units, resulting in a combined adjusted offense level of 40.

And Mr. Duffy is a repeat and dangerous sex offender against minors, so under Section -- or sentencing guideline Section 4B1.5(b)(1), the applicable offense level is 45, so that adds five to that adjusted offense level of 40.

And three levels are subtracted under guideline Section 3E1.1 for acceptance of responsibility, resulting in a total offense level of 42.

The Court finds the criminal history score of 14, and that establishes a criminal history category of VI, and this yields a sentencing guidelines range of 360 months to life -- that's 30 years to life imprisonment -- a term of supervised release of five years to life per count, and a fine of 50,000 to $250,000.

So, does counsel have any objection or response to the Court's calculation as to the offense level or criminal history category?

Ms. Preston?

**MS. PRESTON:**  No, Your Honor.

1    **THE COURT:**  Mr. Riggins?

2        **MR. RIGGINS:**  No, Your Honor.

3    **THE COURT:**  All right.  Mr. Riggins, would you

4 and/or Mr. Duffy like to make statements today?

5        **MR. RIGGINS:**  Yes, Your Honor.  I'd like to start

6 with Mr. Duffy; and then I will follow it with a brief

7 statement from his parents, and then also brief argument from

8 myself.

9    **THE COURT:**  Okay.  Please make sure that that

10 microphone is lined up with him wherever he situates himself.

11        Now, Mr. Duffy, people have a tendency to get up

12 here and speed up.  And for the benefit of the court reporter

13 here, just try to be mindful of your pace, all right?

14    **THE DEFENDANT:**  Yes, sir.

15    **THE COURT:**  And I'm going to give you an

16 opportunity, again.  Mr. Riggins introduced them, but why

17 don't you tell me who's here with you today.

18    **THE DEFENDANT:**  My mother, my father, my stepmother,

19 my fiancée, my daughter, and my sister.

20    **THE COURT:**  Okay.  All right.  Thank you all for

21 coming.

22        Please, proceed.

23    **THE DEFENDANT:**  Your Honor, I am no saint, and I do

24 not intend to portray that.  I have had a rough and abusive

25 life.

1       Growing up, I moved around a lot, due to my mom

2  being military and then later because my stepfather was

3  military.

4       My parents separated when I was little.  When I was

5  three, I lived with my dad in California and then moved to

6  Berlin, Germany, with my mother and my first stepdad.  At age

7  six, I started stealing money and mail for no reason.

8       I was diagnosed with ADHD and was placed on

9  medication, which caused severe reactions, causing me to throw

10 myself down stairs, into walls, setting fires, until I tried

11 to set our apartment on fire.

12      By the time I came back from Germany, I was a

13 different child.  I was no longer myself.

14      From the ages of eight to twelve, I lived in Orange

15 Park and Jacksonville, Florida.  When I was twelve, my stepmom

16 and my dad -- excuse me -- my stepdad and my mom got divorced.

17 My mother attempted suicide, causing me to live with my aunt

18 and uncle for a while.

19      A few months after my mom was released from a mental

20 health clinic, she started dating a man named "Tony."  The

21 entire time they dated, he physically, emotionally, and

22 sexually abused me for the relationship.  I tried to tell my

23 mom; but she dismissed it, choosing him over me.  I was

24 relieved when they split.

25      By thirteen, I had become very sexually active with

girls from school.  By the time I was fourteen, I had slept
with over twenty girls.  I never stayed with anyone because I
felt it was normal to sleep around, as I had seen it being
done.

At the time, my mom had started dating and
eventually married another man.  He physically abused me for
years.  One time, he hurt me so badly by slamming the front
door on my ribs, I tried to get away out of a window, only to
be dragged back in and to have my head slammed into his
steel-toe boots multiple times while my mom just stood there
and watched.

I ended up doing two years in juvenile for grand
theft and credit card fraud.  I was acting out to make him and
my mother split.  I even told her he was selling drugs to our
14-year-old neighbor.  She refused to believe me.  It was only
until I was in juvenile that she finally found out I had been
telling the truth.

By then, I had so much anger and rage, I only
continued to lash out by stealing and having unprotected sex
once I got out, causing me to go back to juvenile.

At the age of 16, I moved to Indiana with my father.
I lashed out at him.  I was disrespectful, defiant, and
uncaring.  I stole his cars for no reason.  I would throw
parties at his house when he would leave for work.  I carried
a gun, started getting into fights and stealing.  After a

year, I stole money from him and jumped on a Greyhound back to Florida. I didn't speak to my dad for the next eight years.

Once I got back to Florida, I went right back to my old groups and my old ways. After being back a month, I was arrested on my 18th birthday. For the next five years, I stayed in and out of prison, with only five months in between, only to go back.

After getting out, I tried to have a normal life. I got a car, a job, and a home; but I struggled for years trying to deal with the abuse I suffered in prison, being beaten to the point of unconsciousness by officers who were supposed to protect me, the rape I suffered while officers stood by and laughed, saying I deserved it.

I struggled with all of this and being free for the first time in a long time. I felt weak. I felt that I was falling. I started going to clubs every night, every day, sleeping with dancers and any woman that wanted me. I lost jobs and started backsliding until I met a woman who changed my life. For a very long time, I had a woman who loved me. But when it came time to commit, I backtracked and walked away. I can't commit because I have spent years watching the abuse me and my mother have suffered in all her failed marriages. I didn't want it to happen to me.

Finally, in 2013, I had to get away. After moving to Indiana -- sorry -- I began working and sleeping around. I

1  struggled with keeping a job, moving around for work, moving
2  in with girls I barely knew, attempting to be a father to my
3  daughter and failing miserably.
4         After a few years and the loss of my front teeth due
5  to an accident, I didn't feel wanted, so I took to dating
6  apps.  But as soon as they heard I had fake teeth, they would
7  just leave.
8         I finally posted on an app where I met the
9  defendants who responded to my posts.  I never questioned
10 their ages, as it was an adult site; and it never came up.  We
11 just enjoyed the conversation; and a relationship ensued,
12 though it was neither of our intentions.  I did not seek this
13 out, nor did I seek this relationship.  It happened.
14        After the age became known, I became disgusted with
15 myself, and I felt, being the adult, I should have questioned
16 things a lot more; but I was so blinded by finally being
17 wanted that I know I had to allow myself to just not pay
18 attention.  I do not blame them.  I only blame myself because
19 I am the adult and should not have allowed any of this to
20 happen.
21        I wish I could take it all back because I know I
22 have hurt them and their families.  I only hope that they can
23 find it in their hearts to one day forgive me.  Even though
24 they are not here today, to them both, I am truly sorry for
25 any and all pain I have caused.  To their families, I am also

1  sorry because I know you have suffered just as they have.

2  These were never my intentions.  I only hope you can heal and

3  one day forgive me for everything.

4        To my own family, I am sorry that I can never seem

5  to do right and stay out of trouble.  I am sorry to keep

6  putting you through these type of things.  I know you are

7  tired of it.

8        To my father, my stepmother, my sisters, and my

9  beautiful niece and nephew, I am sorry I won't be around; and

10 I hope you remain a part of my life.  I am sorry I won't be

11 there to watch my niece and amazing nephew grow up.

12        To my wife, Angela, and my daughter, I am sorry to

13 leave you to raise her alone and that, again, you must suffer

14 and wait for me to get out.

15        To my amazing daughter, I am sorry I cannot be a

16 better father.  I am sorry.  You will probably be grown with

17 kids of your own by the time I come home.  I only hope you can

18 forgive me.

19        To my mom, my stepdad, and my grandparents, I wish I

20 could have been more of the person you wanted me to be.  I'm

21 sorry I failed you.

22        I know this was supposed to be brief, but it is not

23 easy to sum up my life and how sorry I am.

24        I know I must go to prison.  I can only ask that

25 it's not forever so that I can have a chance at life with my

beautiful wife and my amazing daughter.

I know I have been in trouble most of my life; but I plan to further my education, learn some trades so that when I do come home, I will have a better chance to get a job so that I won't struggle and so that I can re-enter society with the ability to contribute and not come back.  I also will plan to try to keep family connections so I will have a support system and not just be out with nothing.  I want to work and just be a normal person in life.

I hope you will allow me to be young enough to do that successfully.

Thank you.

**THE COURT:**  All right.  Thank you.

Mr. Riggins, when you're ready.

**MR. RIGGINS:**  Your Honor, I have a few comments from a few people that I'd like to read and proffer their statements.

The first one is from his father.  His father wants the Court to know that he loves his son very dearly.  He is deeply sorry for what has happened.  He hopes that this Court will find a way to be lenient upon his son.

His son has held jobs and worked hard.  His father has pointed out the fact, some of the things that Joshua said during his statement, that he was taken away from his father at a very early age and not given the opportunity to learn

1  directly from him.  He believes that this would have made a

2  different outcome in Joshua's life had he had that

3  opportunity.

4          He would ask the Court to give him a sentence that

5  is reasonable and the least amount that the Court could

6  possibly give.

7          **THE COURT:**  Okay.

8          **MR. RIGGINS:**  I have a statement from his mother.

9  Both of these statements were given to me today.  His mother

10  said that she would like --

11          **THE COURT:**  I'm sorry, Mr. Riggins.

12          So, Mr. Duffy, thank you.

13          And the mother's name is?

14          **THE DEFENDANT:**  Tina McCarty.

15          **THE COURT:**  Ms. McCarty, thank you.  Thank you for

16  your service.

17          Go ahead.

18          **MR. RIGGINS:**  Ms. McCarty says, "I would like to

19  start by saying that Josh didn't have it easy growing up.  He

20  was raised by a mother with an undiagnosed mental health

21  disorder, but he's been a wonderful son in spite of it.  Since

22  he was a small child, he was always -- had a heart of gold.

23  He would always put the needs of his friends above his own.

24          "In all honesty, I don't really understand the

25  current situation.  In any case, he has been my baby and means

1  everything to me.  He has always been a very loving and
2  affectionate son."
3          **THE COURT:**  Okay.  Thank you.
4          **MR. RIGGINS:**  Your Honor, the lady that he referred
5  to as his wife, Angela, and whom he very much intends to marry
6  as soon as possible would like for the Court to know that he's
7  been the backbone of their family, that he's provided for
8  them, and that he's always been there for them financially,
9  emotionally, in all ways.
10          His daughter --
11          **THE COURT:**  Thank you, Ms. Ingram.
12          **MR. RIGGINS:**  And his daughter, under these
13  circumstances, would like the Court to know that, in every
14  important event in her life, he's been a great support, that
15  he's been there for her, and that she would ask the Court to
16  give him the least amount of time that you possibly could.
17          **THE COURT:**  All right.  Kylia-- is that right --
18  thank you.
19          **MR. RIGGINS:**  Your Honor, I submitted a 13-page memo
20  to the Court outlining the reasons why I think that Mr. Duffy
21  should get the lower end of the range that is listed in this
22  plea agreement.  I'm asking the Court to give him 20 years;
23  and I've highlighted, in particular, the need for
24  rehabilitation.
25          I think this is one of those circumstances where

1  Mr. Duffy was born into a very difficult situation in which

2  there were some undiagnosed mental illnesses, that Mr. Duffy

3  was neglected for a large portion of his life.  Even after he

4  became an adult, in his case, he has some undiagnosed mental

5  health issues, as well.  While he listed as ADHD, I believe

6  that there are some other things that are seriously going on

7  under these circumstances.

8          The Court is well aware that he has been in and out

9  of prison before.  And given the fact of the things that he

10  said that were hardships for him that happened to him while he

11  was in prison and throughout his life, he continued to engage

12  in conduct that would lead him down a path that subjected him

13  to that conduct again.  We're here in court today under the

14  same circumstances.

15          And I think the good thing about the federal prison

16  sentence is that there is help available for him to get the

17  kind of mental health and treatment and counseling that he

18  needs to get beyond the issues that he had as a child, as an

19  adult, and, more importantly, to get his mental health in a

20  better state so that he can be a good husband and a good

21  father.

22          We ask for 20 years because we think that that's a

23  reasonable amount of time for him to get the necessary

24  treatment and counseling that will put him on the road to

25  success.

1          I would point out that it would also put him in a

2    position to receive some sort of skill that would make him be

3    a good providing father as well, so he would be able to

4    provide financially for his family upon being released from

5    federal prison.

6          As you heard here today, he's accepted full

7    responsibility in every way, shape, form, and fashion for what

8    happened.  He is deeply sorry and regrets what's happened to

9    these young ladies.  He understands it will continue to

10   traumatize them in their life.  He understands that it

11   traumatized their family.  And for that, he is deeply sorry,

12   Your Honor.

13         We ask that, when you consider the factors of

14   3553(a), that you give him a sentence that is sufficient but

15   not greater than what is necessary in order for him to get the

16   education, health, mental health treatment, and other services

17   that will be necessary for him to be a productive person upon

18   his release from federal prison.

19         With that said, I leave it at the Court's

20   discretion.

21         **THE COURT:**  All right.  Appreciate that.  Thank you.

22         Ms. Preston, would you like to come up here or stay

23   there?

24         **MS. PRESTON:**  Your Honor, if I could approach the

25   lectern, please.

1          **THE COURT:**  Sure.

2          **MS. PRESTON:**  Your Honor, as I indicated before,

3     there are victims -- family members of the victims who do wish

4     to speak today, and we can do that at any point Your Honor

5     wishes.

6          **THE COURT:**  I will leave that to your discretion,

7     however you want to proceed.

8          **MS. PRESTON:**  Well, I think, Your Honor, for their

9     sake, I would like to actually call the parents of Minor

10    Victim 1.

11         **THE COURT:**  Okay.

12         **MS. PRESTON:**  And I have indicated to them that I

13    will be referring to them by their pseudonyms to protect their

14    identities, as it's a public forum.

15         **THE COURT:**  Sure.  Yes.  Yes.

16         As I said, folks tend to speed up when they get up

17    there, so just have a little mercy on the court reporter here.

18         **MS. DAVIS:**  I will.

19         **THE COURT:**  And this is not easy to do so I

20    appreciate you coming up here.  Thank you.

21         **MS. DAVIS:**  Your Honor, my name is Lisa Davis; and

22    I'm 56 years old.  I have an MBA.  I'm in marketing and

23    business development, and I am speaking to you today as victim

24    No. 1's mom.

25         My husband and her father is here with me.

1      It's important that you know that our daughter is
2 amazing, that we love, we support her.
3      I know that you read my victim impact statement.  It
4 was quite long.  I know you read it.  I wanted to address the
5 Court today in order for you to see my face and hear my voice.
6      It's important to me that you understand what our
7 family experienced as a result of the violent and brutal rape
8 of our daughter in our home while we were sleeping.  It
9 happened in our home.
10     I witnessed my daughter's rape firsthand.  No, it
11 wasn't -- it wasn't in real time, but I was there.  I found
12 the videos on her phone.  I heard her cries.  I saw her face.
13 I saw her fear.  I saw what she experienced, and I felt her
14 pain.  And I, as her mom, continue to feel her pain.
15     I read the threats that were sent to her phone.  The
16 threats that were sent to her became very real to us.  Those
17 words, "I'm going to send other men to your house, and you
18 will do to them what I tell you to do to them," those words
19 were sent to her phone.  Those words took on a life of their
20 own.
21     I was diagnosed with PTSD that summer.  Most people
22 associate PTSD with those who have experienced active military
23 service.  Those men react and relive the trauma every time
24 they experience a trigger:  Loud noises, fireworks, a certain
25 smell.  It takes them right back to that raw emotional place.

1       Your Honor, what happens if the trigger is in your

2   house?  My triggers, after finding the video and reading the

3   threatening texts on my daughter's phone, are visual.  My

4   triggers are extremely personal, as the crime scene in this

5   case took place in our home, in our basement.

6       I remember the night the detective and crime lab

7   technicians came to our house to collect forensic evidence.

8   They took the samples from our house.  And from that point

9   forward, our basement was forever off limits.  We disposed of

10  the furniture.  We got rid of the air hockey table.  We moved

11  the TV upstairs.  The door was locked permanently, off limits.

12      We put our house up for sale.  And every time

13  someone asked me why we were selling this beautiful house in

14  this nice neighborhood, when our -- why were we doing that, it

15  was all I could do not to scream at the top of my lungs,

16  "Because my daughter was raped in that house."

17      Red cheer bows are another trigger.  Your Honor, I'm

18  sure you viewed the video.  What stands out in the video is

19  this young, scared girl, with glasses and her red cheer bow.

20  Do you know how many red cheer bows you see if you take

21  notice?  If you walk outside this courtroom and you walk down

22  the street or you go to the grocery store or you go to the

23  movies or you go to the mall, do you know how many red cheer

24  bows you see?  Every time I see a red cheer bow, the video

25  replays in my head, in my mind.

1    My husband's experience is different.  As a man and
2  a father, he continues to struggle with how an adult male
3  could violently and brutally rape a child the way that he did.
4  It's unthinkable.  It's unspeakable.  It's horrific.  It's
5  horrific to even consider it.

6    My daughter's experience is heartbreaking.  We
7  watched her go from a confident, outgoing, high-achieving
8  teenager, a musician, a cheerleader, an athlete, to someone
9  who barely left her room, except to go to school and therapy.
10 We work with the school and her therapists to create a 504
11 plan to help her with her anxiety.

12    Most parents give their teenagers a to-do list that
13 includes chores and to set expectations.  We gave our daughter
14 a to-do list to get her out of her room.  She was expected or
15 asked to plan or participate in one event weekly, things that
16 most teenage girls do, like go to the mall, go to Starbucks,
17 see a movie.

18    She had a part-time job that summer.  I was so
19 terrified by the threats made against her that I would drop
20 her off and I would wait in the parking lot until she finished
21 her shift.  Some days, I would sit on a nearby bench so that I
22 keep her in my view.

23    For my daughter having to tell her story over and
24 over and over again to the detectives, having to answer
25 difficult questions, her experience at Community Hospital, in

1  Riley Hospital for Children, her therapy, that is now part of

2  her story.

3       Your Honor, I came here today as victim No. 1's mom.

4  I am talking to you now as advocate No. 1's mom.  As a mother,

5  as a daughter, as a woman, as a member of this community, we

6  have an obligation to make sure that no other parent

7  experiences what I experienced.  We have an obligation to make

8  sure no other family experiences what my family experienced.

9  And most importantly, it is our responsibility to make sure

10 that no other teenager, that no other child is subjected to

11 the violent rape that my daughter and others experienced.  It

12 is our duty to protect our children and our community.

13      Thank you.

14      **THE COURT:**  Thank you, Ms. Davis.

15      **MS. PRESTON:**  Your Honor, I'd now ask permission to

16 allow representatives from Minor Victim 2's family to

17 approach, if they choose to.

18      This is her mother.

19      **THE COURT:**  Yes.

20      **MOTHER OF VICTIM 2:**  Thank you for allowing me to

21 speak just briefly this morning.

22      I would like to begin by letting you know that my

23 daughter, victim No. 2 in this case, is doing wonderfully.  My

24 daughter is kind and generous.  She does well in school.  She

25 has many extracurricular activities and works a part-time job.

My daughter is planning for her college years, and we know
that the sky is the limit for her.

Because of these events, she actually plans to go
into some sort of counseling role in the future.  She is
strong in spirit and courageous.

My daughter was recently asked to speak to the
faculty at her school about surviving sexual assault.  Through
intensive counseling with the amazing staff at Prevail and
horse therapy, my daughter has begun to heal from these
events.

And while my daughter chooses not to live in fear as
a victim, she will carry the emotional wounds inflicted upon
her by Mr. Duffy for all of her days.  The pain, trauma, and
fear will sometimes rear its head.

There is evil in this world, and I believe that it
sits with us this afternoon in this courtroom.  I do not
believe that Mr. Duffy was born evil.  I believe that the
circumstances of his life led him down a very dark, very wrong
path; and I do not know that there is any amount of punishment
or rehabilitation that will make him good.

You can listen to his list of prior convictions,
dating back to when he was a young man, and know that his
family, his community, the criminal justice system, and the
world failed him.  He has failed himself and in so has
victimized my daughter and at least one more young woman.  He

created lies to gain the trust of children so that he could
manipulate and sexually victimize them.  You can listen to
those prior convictions and know that his crimes were
escalating in deception and violence.

I ask this afternoon that the Court give Mr. Duffy
the maximum sentence of 25 years in prison.  Anything short of
that is an insult to the suffering that my daughter and our
family have gone through and would be an egregious error of
the Court.

Thank you.

**THE COURT:**  Thank you.

**MS. PRESTON:**  Your Honor, I've confirmed that the
victims' families who wished to address the Court in person
have now all spoken.

**THE COURT:**  Okay.

**MS. PRESTON:**  And so, with permission, I'd like to
address Your Honor.

**THE COURT:**  Please, proceed.

**MS. PRESTON:**  And I, as we've indicated before, will
indicate to you when I begin to describe the nature and
circumstances of the offense.

Your Honor, it is the United States' position that a
sentence of 25 years imprisonment and a lifetime of supervised
release, in addition to the restitution set forth in the plea
agreement, is sufficient but not greater than necessary to

1  comply with the purposes set forth in 3553(a).

2         I am going to begin by discussing the nature and

3  circumstances of the offense.  But before I get to a

4  description of the actual rape that occurred of both victims,

5  I wanted to say, with parents present, that this is a

6  defendant who groomed, exploited, targeted, and had sex with

7  two children.  He's a 32-year-old adult.  And, yes, these, his

8  victims, were children.  One had barely turned 14.  The other

9  was 15.  And he used the Internet to target them, to groom

10 them over a period of time, and then, for at least Minor

11 Victim 1, to use threats and coercion against her to get what

12 he wanted.  And then he had sex with Minor Victim 1 and

13 committed sexual acts against Minor Victim 2, and just tossed

14 them away like they were nothing.

15        I do now need to go into detail to describe the

16 nature and circumstances of the offense; and I want to

17 indicate, for the record, that I have discussed with the

18 family members what I'm about to say here today and have

19 indicated that it will be graphic.  They have indicated to me

20 that, if they choose, they may choose to leave the courtroom

21 for a while and come back; but they've also indicated to me

22 that it is very important for them for you to know the kind of

23 suffering that their children endured, so they have given me

24 permission and license to go into great detail about what

25 happened to their daughters.  So I wanted to make that clear,

1  for the record.

2          First and to be clear, we as law enforcement know
3  more concrete details about what the defendant did to Minor
4  Victim 1 than we do Minor Victim 2, and that's simply because
5  there was a 41-minute-and-38-second video that remained
6  forensically that showed us exactly what happened to Minor
7  Victim 1.  We saw, and I attached in filings, the messages
8  that led to that 41-minute-and-38-second video.

9          And I want to be clear from the outset that when I
10 describe the nature and circumstances of the offenses in this
11 case, you'll probably, on balance, hear more from me about
12 Minor Victim 1 than Minor Victim 2; but that doesn't make what
13 happened to Minor Victim 2 somehow less deplorable.  Indeed,
14 she was younger, and the defendant employed the same
15 techniques of grooming and coercion against her.

16         The fact of the matter is we only had a shred of the
17 forensic evidence on Minor Victim 2 that we had with Minor
18 Victim 1, so I wanted to make that clear, that on balance,
19 that's why you'll hear a bit more about the nature and
20 circumstances of the offense with respect to Minor Victim 1.

21         Your Honor, here is what we know of the defendant's
22 rape of this girl.  And, yes, it was rape.  Minor Victim 1 was
23 15 years old.  She was a good kid.  She was getting fantastic
24 grades.  Her mom said, as you just heard and she told me
25 before court today, she was outgoing.  She had an adventurous

spirit, and she was always up for new challenges and to try new things like cheerleading.

And I'm using past tense for a reason, because at least for a time now, the defendant has changed all of that.

The thing is, Judge, is that Minor Victim 1 was just a 15-year-old girl. And like a lot of 15-year-old girls, she was insecure. She was looking for what a lot of girls that age seek: Acceptance, feeling of being desired, to hear somebody tell her that she was pretty, to pay attention to her. And that's not because she wasn't a part of a very warm and loving family, who I've gotten to know. In fact, the opposite is true. They did love her, and they did accept her. It's just that she was 15 years old. And she did what a lot of 15-year-old girls do. She sought out attention.

But the fact is, Judge, she had no idea what she was getting herself into because she didn't know that she was communicating with someone who was a predator, because that's what the defendant is.

And when the defendant saw, right off the bat, that this 15-year-old girl was someone who was vulnerable, who was insecure, who needed those things, he didn't stop communicating with her and move on to someone who was an adult.

And, yes, Your Honor, it was quite clear for both victims that this defendant knew that they were minors when he

1  was communicating with them.  They talked about their moms and

2  dads.  Minor Victim 2 said she was 14 years old and a

3  freshman.  He knew.

4         You saw those messages between Minor Victim 1 and

5  the defendant -- I attached them as an exhibit -- and he used

6  very common grooming techniques with her.  First, he offered

7  love and attention.  That was his lure, his hook.  And then

8  once he ensnared her through positive attention, he did what

9  we in law enforcement refer to as the "pull in" and the "push

10  away."  He went from offering acceptance and love to then

11  threatening to take it away, because what that does from a

12  psychological perspective, particularly with someone with the

13  mind of a child, is that when you give the child the attention

14  they've been wanting to receive and threaten to take away,

15  they switch to reassurance.

16         So it became the child -- in this case, Minor Victim

17  1, the 15-year-old -- who was trying to reassure the defendant

18  how great he was, and she would do anything to please him.

19  And you see that play out in those messages that I attached,

20  Your Honor, between Minor Victim 1 and the defendant.

21         The defendant says, "You're mean to me.  Answer your

22  goddamn phone.  You keep breaking promises to me.  You

23  promised you were going to do this, and you never do it."

24         That's classic grooming, Your Honor.  It's

25  statements of a predator.

1          The defendant caused Minor Victim 1 to switch into
2   reassurance mode, saying, "Well, am I making you mad?  Why?
3   How do you think I feel?"
4          And then he ups the ante.  And you see on page 2 of
5   the messages I attach, he then starts discussing sexually
6   explicit messages with Minor Victim 1.  He says to her,
7   "You're going to take your punishment for not doing the things
8   I've asked of you," placing her in a submissive relationship
9   right off the bat.
10          And then those sexually-explicit messages go from
11  those to threats, to threatening Minor Victim 1 specifically
12  by telling her, a 15-year-old girl, "I'm going to tell your
13  mother.  I'm going to tell your mother."
14          And Minor Victim 1, as you saw in these messages,
15  starts to beg.  She starts to beg the defendant.  "My mom will
16  murder me.  My mom will murder me.  Please.  She'll torture
17  me.  Please, don't."
18          And then he says to her, "I'm going to tell her
19  everything since I'm such a horrible boyfriend to you."
20          "No.  Please, don't."  Minor victim 1 says to this
21  adult, "I'll do anything to make it up to you.  Please, stop."
22          But he didn't.
23          She begs.  She begs some more on page 3.
24          And then he tells her, "Please.  Please.  I'll do
25  anything.  Please, stop."

1    And he says, "You blocked me and so I'm heading

2 over," meaning she blocked his phone from her phone.  "You

3 blocked me.  I'm heading over."

4    "No.  Take me back."  This is Minor Victim 1.  "Beat

5 me.  Do anything.  Don't come here.  I beg you."  She said,

6 "I'll sneak out for you."

7    She just didn't want him to come to her home with

8 her parents.  She was scared.

9    She says -- he says to her, "Oh, I'm coming there

10 all right."

11    She says, "Please, I can't breathe.  Please, stop."

12    "Nope, I'm coming over."

13    And then he tells her what he's going to do to her

14 when he gets there.  He says, "You're going to get your ass

15 beat, then fucked."

16    Sorry, Your Honor, for the language; but that's what

17 this case is, and that's what it's about.

18    And she says in response to that, this 15-year-old

19 girl, "You won't tell?"

20    He says, "Yes, on one condition."

21    She said, "I'll take the pain.  I'll obey.  Just

22 don't get me in trouble, please."

23    And he says to her -- she asks him -- excuse me --

24 "What's the condition?"

25    And he says, "You have to do whatever I want when I

1  want it."

2          He goes into details -- you just heard Minor Victim

3  1's mother -- about how, even if he sends other men to her

4  house, that she's going to have sex with them and do whatever

5  he, the defendant, tells her to do to them.  This is all to a

6  child, to a 15-year-old.  And then the thing is, he made good

7  on his threats.

8          What's sad about this, Your Honor, is these messages

9  go on for hours.  He worked her for hours.  And the whole

10 time, he's telling her he's going to come there, and she's

11 going to just have to do what he says or else he's going to

12 tell her mother.

13         He used this little girl's love for her parents as a

14 sword so that he could rape her, and that's what happened

15 here, force, coercion, psychological torture by a skilled

16 criminal against a child.

17         And she went online wanting just someone to accept

18 her.  But, boy, did she fall upon the wrong person; and that

19 is not her fault.

20         So what did she do?  Her parents were at a next-door

21 neighbor's house, so she reached out to her parents and begged

22 them to come home quickly because this man is barreling

23 towards their house.

24         And he keeps telling her, "Get your mom there and

25 get her in bed and to sleep."

1       Mom and dad get her calls.  They come home.  They go

2  up and fall asleep in their home, believing both of their

3  children, including Minor Victim 1, are safe and sound in the

4  sanctity and security of their own home.

5       But, boy, how wrong were they, because this man, not

6  so long after her parents got home, came to the dining room

7  window where Minor Victim 1 let him in.  She opened the window

8  so he could creep in.  There's no question how young she was.

9  He had to sneak into her parents' home.

10      She leads him downstairs; and the first thing he

11  does is he absolutely wants to confirm, right off the bat,

12  that what he ordered her to do she had done.  And what was

13  that?  You saw it in the messages.  He wanted her to set up

14  her phone, her camera, so that it could record what he did to

15  her.

16      So what you see, as this video starts, is she sets

17  up her phone.  She lets him in.  He comes into the house, into

18  the basement; and then he sits with her.  He starts rubbing

19  her breasts immediately.  There's no talk.  There's no

20  relationship here.  He was there for one reason, borne out by

21  the fact that 20 seconds after he arrived, that's exactly what

22  he started doing.

23      But you see him in the camera look over and point at

24  the phone and ask her, "Where's the camera?"  And you see her

25  mouth, "Right there," and she points to.  He shakes his head

1  like this (indicating), and then he starts to attack her.

2        And that's what this was, Judge.  This was not

3  consensual sex.  What the defendant did is sneak into this

4  family's home, go into this basement, and rape their daughter

5  for 41 -- at least 41 minutes.

6        He wasn't there to tell her she was pretty, to treat

7  her with any semblance of respect.  He wasn't there to make

8  her feel good about herself.  He didn't even talk to her

9  really.  He barely talked to her.  He just ordered her around

10  and snapped her around.

11        And we were only able to see 41 minutes and 38

12  seconds of it because her phone died.  He left 20 minutes

13  after that, which we've confirmed through messages; but what

14  we could see in that video was horrifying.  It was forceful.

15  It was painful, and it was tortuous.

16        So what you'll see is exactly what her mother

17  described.  Minor Victim 1 tried to sit on the couch and just

18  watch TV with the defendant.  She literally starts watching TV

19  with him, and he doesn't want to do that.  He immediately

20  starts groping her.

21        And there she is, Judge, in a pink, little high

22  school t-shirt with a huge cheer red bow on top of her head

23  and glasses.  She presents as a child.  She looked like a

24  child.  And there was nothing that was going to stop him from

25  doing what he wanted to do.

1    This was a child, by the way, whose mother told me

2  she had American Girl dolls in her closet when this was going

3  on.

4    After the defendant, for just a few seconds,

5  actually, began rubbing her breasts, it just lasted for

6  seconds, he ordered her to her knees.  And when I say

7  "ordered," he ordered her to her knees, like that.  He pushed

8  her head down onto his penis, and he used his hand to force

9  her head down onto it.  She resisted, she gagged; and that

10  just made him push harder, and then she gagged some more, and

11  this went on and on and on.

12    And then he told her she was done doing that, but

13  she wasn't done done.  It got worse.  He put her on the floor,

14  facing away from him, and he took the back of her head, and he

15  forced it down to the ground, forced her head against the

16  carpet, pushed her down onto his knees hard, and this is when

17  he raped her.  He tried to insert his penis into her anus.

18    And this, Your Honor, unimaginably, is this child's

19  first sexual experience.  She was a virgin, and he forced her

20  penis into her anus.  And, not surprisingly, it hurt.  There

21  was video -- sorry -- there's audio on this video.  She

22  screamed.  His reaction, he pushed her down harder; and then

23  he tried again.

24    She said, "Daddy, daddy, don't.  That hurts.  That

25  hurts."

1    But he didn't care that it hurt her.  He didn't care
2  about her at all.  She was a thing, something to control, a
3  temporary possession.

4    And when he was having difficulty having anal sex
5  with her, you can see the defendant spit on his hand and then
6  push his penis even harder inside of her anus.

7    And you can see, Judge, in her face, in the
8  tenseness of her body, the physical pain that she was
9  enduring.  He wasn't gentle, and he didn't care that she was
10 in excruciating pain.  All you hear on the video is her
11 saying, "Ow, ow, ow."

12   At one point, she tried to pick her head off of the
13 carpet.  She tried to turn around and look at him; and she
14 puts her hand back to try to get him to stop.  He turns her
15 head, pushes her down and keeps her head down on the floor.

16   And then you can see this pained look in this
17 child's eyes as she realized what kind of person she had let
18 inside of her home.  And you can see in that video the fear
19 and the humiliation and just the waiting for it to be over and
20 for her misery to end.  But, for goodness sakes, it went on
21 for more than 41 minutes.

22   And, by the way, at the point at which I'm at,
23 Judge, is 15 minutes into this ordeal.  All of that had just
24 happened in 15 minutes.

25   And in the next 10 minutes, he orders her to get up,

1  only to throw her back down.  He literally was throwing her

2  body places.  He continues to anally rape her.

3        You hear her pleading with him, "Ow, ow, ow."

4        And then, at 17 minutes and 40 seconds, he yells at

5  her.  He says, "Get up."  And he does this dismissive sort of

6  gesture like you would a dog who was misbehaving.  And he

7  pushes her to the side.  He smacks her on her bottom.

8        And she says, "Daddy, no, please."

9        And, then, for the next several minutes, he just

10  continues from all sorts of different and painful angles to

11  rape her.

12        There are sounds of obvious pain.  She says, "Oh, my

13  God, no.  That hurts.  I can't."

14        But he doesn't stop.

15        And then she turns around, at one point, because he

16  makes her; and so the video captures him sitting back down on

17  the couch, and then he makes her perform oral sex on his penis

18  which had just been in her anus.

19        And you can see her wiping against her bottom, and

20  that's because she was bleeding, as evidenced by the clothes

21  that were later found by her parents, where -- to put it in

22  the word of the child's mother, blood where there isn't

23  supposed to be blood in her clothes.

24        He stopped, seemingly done with her.  He puts on his

25  shorts.  And what you see her doing is she's on the couch on

1  all fours frozen.  Her body is tense.  He tells her to get up,

2  and she does.

3          And what you see, Judge, is this little girl wearing

4  a bow.  She pulls down her glasses partway just trying to get

5  rid of the tears.  And for a split second, you see this relief

6  in her face because she thinks it's done because he put his

7  shorts on, but it wasn't.  He let her think it was done.  But,

8  then, again, like a dog, he literally in the video snaps his

9  fingers and orders her back to the ground and continues to

10  make her perform oral sex on him.

11          He then threw her -- again, threw her -- body on the

12  couch, forcibly lifted his legs over -- her legs over his

13  shoulders and anally raped her, and that's where the video

14  stops, and we don't know what happened after that.

15          Forty one minutes and 38 seconds of this video.  He

16  left 20 minutes later and then messaged her on his way back

17  home.  And the first thing he messaged wasn't, "Are you all

18  right," or anything nice or anything reassuring.  He gave her

19  his e-mail address because he wanted to ensure that she would

20  send him that video right away, but it was too large of a

21  clip.

22          And the defendant literally after this ordeal

23  belittles her and says he wanted that video no matter what

24  before he goes to bed.  She kept trying to send it, but the

25  clip -- it's 41 minutes -- is so long, she couldn't get it

sent through regular means.  He says to her, "Fine.  I better have it tomorrow."

They say good night, and that's the last she ever heard of him.  He tossed her to the side like a piece of trash, shut down contact, leaving this little girl all alone to deal with what he had done to her.  And that's Minor Victim 1.

Judge, Minor Victim 2 was barely 14 years old.  She, too, craved acceptance, love, the need to be desired.  She, too, was insecure, and she met the defendant again on an online app.

He spent more time grooming her, exploiting her insecurities, her desire for acceptance.  And in the same way, just as he had done with Minor Victim 1, he lured her in.  She openly told him during these exchanges that she was 14 years old, that she was a freshman in high school.  He knew how old she was.

He then convinced Minor Victim 2 to leave the safety and sanctity of her own home and meet with him.

By the way, this is the same summer that he had raped Minor Victim 1.

He picked Minor Victim 2 up outside of her parents' apartment complex.  And at first, the way she describes it is, they just drove around.  But then he started kissing her.

And when the forensic interviewers asked, "Well, did

you want to kiss him," she said, "Well, I don't know; but I guess I didn't stop him."

But it progressed. And at this point during her forensic interview, Minor Victim 2 collapsed in on herself and became so ashamed and shy that she couldn't say what happened out loud. So the forensically trained interviewers told her that, if she couldn't say it out loud, that she could describe it or write it on an easel, which she did.

And after she finished writing, they asked if she could read, simply, what she said about what happened to her out loud; and she said, "Well, he pulled me to the back seat. He started kissing me and touching my breasts." And she said -- these are her words -- "I didn't understand. I didn't know what was fully happening. But before I knew it, he moved my hand to my lower area."

She didn't even know what the right words were or what to call it. She said, "He rubbed me for 30 minutes or so." And they had to pull from her -- because she's young and a child and didn't understand what that was -- that rubbing her meant not just rubbing the outside of her vagina but inserting his fingers into her vagina.

She said -- just to give you an indication of what the mindset of this little girl was, her mom had picked out a nice outfit for her to wear for her first day of school. And what the defendant said was that he liked it and she better

wear it every time that she sees him, and she did.  She wore

it, again, because he asked her to, at least one other

exchange.

So the forensic interviewers who had to work with

her had to do so very carefully because she was so withdrawn,

and what she described is that she did meet with Mr. Duffy

again and again.

And then on the fourth time, which was August 23rd

of 2016, she slipped out of the back door of her parents'

apartment, went to the clubhouse so he could pick her up.  And

this time, they drove around again; and she began by telling

them that it was sort of a repeat of what had happened on the

third occasion.

But then she said that she looked down and noticed

she had several calls from her friends and parents who were

desperately trying to locate her.  So she told him that she

had to go, that her parents were looking for her and that he

should drop her off in downtown Westfield so she would not be

caught.

She got a call from her stepdad who said, "Please

just tell us where you are.  We promise we won't be mad at

you."

And she arrived home to find everybody concerned,

wondering why she snuck out and wondering what was going on;

and the police being there, she made up a lie.  She said, "I

1  was so stressed from school, I just went for a walk."

2       But these are her parents.  These are loving and

3  caring parents, and they knew better.  They knew something was

4  wrong, so they let the police leave; and they questioned her

5  some more, and that's when she finally told everyone what

6  happened to her.

7       And again, it took forensic interviewers several

8  times to press her further because she had to draw it again,

9  that not only did the defendant commit the acts that I just

10 described, but he also performed oral sex on Minor Victim 2.

11 She didn't know what oral sex was.  What she said was, "I just

12 didn't understand it.  I didn't understand what he was doing.

13 I had to ask him what he was doing, and then he told me, 'I'm

14 eating you out.'"  And she had to describe that physically

15 because she didn't know what it was.

16      Minor Victim 2, again, said that she didn't

17 understand what was happening at that point; but her cell

18 phone started flashing again, so she told him to take her

19 home.

20      And on the way home, the defendant said, "If you

21 don't get your phone taken away, call me tomorrow."

22      How brazen is this man?  He has now, in one summer,

23 snuck into Minor Victim 1's home and anally raped her.  And

24 now, knowing that you've got a 14-year-old girl that he's

25 pushing just little by little further and further, and her

1 parents keep looking for her, and he doesn't stop because he
2 can't stop.

3        What Minor Victim 2 said happened after that is, at
4 the defendant's instructions -- this is after that -- she sent
5 child pornography of herself to the defendant, videos, images.
6 He sent pictures of himself naked to her, videos of him
7 masturbating.

8        And what she said to officers was that she feels
9 sick inside because she knew, after she first saw him, that he
10 wasn't who he said he was.  He wasn't a high-schooler.  She
11 thought he was young.  She thought he was a high-schooler.
12 But she knew that she was wrong, but she just didn't know how
13 to get out of it.

14        Her pain is no less significant here, Judge.  And
15 while she was not anally raped like Minor Victim 1, she no
16 less was taken from the safety of her home, tricked and duped
17 by a criminal predator and made to do things that she just was
18 not ready to do.

19        I'll, briefly, turn to the next factor, the history
20 and characteristics of the defendant.

21        Your Honor, this is a 32-year-old man.  He has had
22 some college.  He's had -- he was studying psychology and
23 criminal justice.  He has been given opportunity over the
24 years to turn his life around over and over.  And I don't
25 disagree that, in many ways, the people around him, and

1  perhaps even the system around him, failed; but that doesn't

2  mean he didn't have an opportunity for himself to say, "Enough

3  is enough.  I need to get help, and I need to turn myself

4  around."

5          And he didn't.  Instead, each and every time, he

6  appeared before a judge like you, he likely told the same

7  story.  It's all the fault of my past.  It's all of these

8  other things.  I was moved around a lot because my parents

9  were in the military.  That's no excuse.  Certainly, that's

10 hard; but that doesn't make you prey on young girls.

11         He's sitting here saying these things, and the child

12 that he views as his own daughter is in the courtroom; and

13 she's 12 years-old.  That's two years younger than Minor

14 Victim 2, three years younger than Minor Victim 1.

15         He says here today that his to-be wife has been

16 nothing but supportive.  Then why didn't he turn to her and

17 get help before he raped Minor Victim 1 and sexually exploited

18 Minor Victim 2?  They were together at the time.  I don't

19 think you can call a relationship supportive when that's what

20 you're doing behind your partner's back.

21         He said, in his filing, he wished he would have

22 exercised better judgment.  That doesn't even come close to

23 understanding the nature and circumstances of what you've

24 done.

25         Look at the defendant's criminal history.  Between

age 14 and today, he's amassed a level VI criminal history, 14
points.  He's off the charts.  And how many times has he stood
up and said sorry to victims, sorry to another judge?  Five
juvenile adjudications starting at age 14, credit card fraud,
criminal mischief, burglary of a dwelling, domestic battery,
18 adult convictions from driving offenses to obstruction,
burglary, escape from prison, dealing in stolen property,
forgery, battery.  This defendant has no respect for the law,
none, nothing.

How many times has he stood in a court before a
judge and said, "Please show me mercy because I've had a rough
past"?

Enough is enough.  He has been given leniency in the
past, and he has taken advantage of it.  And worse yet,
despite that, his crimes have escalated.  They've gotten
worse.

And the man that was before you today that I saw
crying in front of Your Honor because he's been caught and
he's facing 20 to 25 years in prison is not the same attitude
he showed with Task Force Officer Darin Odier when he was
interviewed.  He was smug.  He's upset now because he's caught
and he's facing a significant period of time in prison.

This isn't a matter of simply not learning a lesson.
This is a matter of a man who's thumbing his nose at the
system and getting worse.  He needs to be separated from

society because society needs protection from him because, if
past is prologue, he's just going to get worse.

He looked at you, Judge and said, "It happened."

It happened?  He made it happen.  It happened, that
this was never his intentions?  Well, just what were his
intentions when he saw these girls?  What were his intentions
as Minor Victim 1 is screaming, "No, no, no"?  This is not,
"It happened."  He did this.

He has the audacity to say today that he felt weak.
These were children.  How do you think they feel?

Your Honor, I'll end by talking about these victims
who face this aftermath.  For both girls, they were 14 and 15
years old.  They're with loving families who are here today;
and I'm sure because of that and the therapy that they have
ensured that these girls have received, that they will be okay
some day.  But these were children with the whole world in
front of them, and now they and their families have a life
sentence.  And make no mistake, that's what this is.  It is a
life sentence for these victims.

I've spoken to both set of parents, and they're
doing what parents of this type of offense do.  They're
grieving.  They're worried, and they deal with this one day at
a time; and they finally deserve justice here, some finality
in this case.

For Minor Victim 1, her parents instantly knew

something was wrong because, even though they went to bed
believing their kids were tucked in and safe in their own
home, when Minor Victim 1 woke up in the morning, she came
down stairs.  And the way they described it to me is she had a
hood over her face.  She was ashen.  She was sullen, and they
didn't know what to make of it; and when they asked what was
wrong, she wouldn't say.

        And she has, based on their description to me --
what I call child victims who have endured something like
this -- she has that thousand-yard stare.  Usually, that's
something used to describe the unfocused gaze of soldiers who
have become emotionally detached from the horrors around them;
but it is also used to describe child victims who have been
raped and who have endured trauma, and that's what she endured
here.

        Minor Victim 1's dad remembers seeing Minor Victim 1
walking abnormally, as though she was in pain, which, of
course, we know now why.  And he asked what was wrong; and she
said, "Everything is fine."

        And despite her pain, this little girl got on her
bike, her bike, and rode to the nearest pharmacy to get a
pregnancy test.  Judge, she was so young and so naive that she
believed she could get pregnant from anal sex; and she did all
that by herself.

        She then had a cry for help.  She took her parents'

truck and then just started driving, which was completely
aberrant behavior by her.  The police pulled her over.  They
went to her parents' house.  They said, "Your daughter took
your truck."

They said, "You're crazy.  She's upstairs in bed."

"Go look."

She wasn't there.  The truck was gone.  And now they
knew something was terribly wrong, and that's when Minor
Victim 1's mother looked at her phone and saw that terrible
video.

They took her to the hospital for testing, and the
hospital separated Minor Victim 1 and her mother.  She was
tested for pregnancy, STD, and AIDS.

By the way, both victims were tested; and they had
to wait at least six months for the results because you have
to go over and over to ensure that nothing's there.  Talk
about worry.

Minor Victim 1's mother was upset and told doctors
about the messages in which the defendant was saying he was
sending other men to her home to rape her, and the doctors
unwittingly then re-victimized her.  They called DCS, and
Minor Victim 1 was taken into DCS custody and was a ward of
the state for 24 hours.  So, for Minor Victim 1's mother, she
just learned that her child was anally raped.  She was
desperately crying out for help, and her daughter was taken

1  away from her because they just couldn't sort out what
2  happened; and then she had to wait for half a year to see if
3  her own daughter had AIDS.
4         When asked why she took the truck, Minor Victim 1
5  said she couldn't feel anything at all.  She felt numb.  This
6  is a 15-year-old who felt dead inside, her spirit destroyed by
7  this man.
8         And, as you heard, they put their family home up for
9  sale.  They never went into the basement.  They told their son
10 it had mold issues so they couldn't go down there, and they
11 had to live in that home until it was sold.
12        She was a 3.8 GPA kid, and her grades tanked almost
13 down to 2.1.  She became an introvert.  And just now -- and
14 this has been years since this happened -- she's finally being
15 able to be a shred of her former self; and she's working her
16 way back, and she's fighting her way back.  And like Minor
17 Victim 2, she is working very hard to recover from what she
18 endured.
19        Minor Victim 1's family is very spiritual.  Their
20 son is a youth minister, and because they believe what
21 happened or at least part of what happened, Minor Victim 1 is
22 now an atheist, which has caused a rift between the siblings,
23 because the son doesn't know what happened or why she has
24 these feelings.
25        Minor Victim 2 was given a rape kit, same waiting

period to try and figure out what was happening, and then describes that feeling of being ashamed in front of her own parents, of being humiliated; but mostly what she said was she felt stupid, that she thought that this was someone who was closer to her age, and she was stunned and shocked when she found out he wasn't.

She's been through hundreds of hours of therapy. She went through counseling, depression, shock, anxiety; and as her mom said, she knows she's going to carry these wounds all of her days, despite all of that.

Both of these girls and their families deserve justice. They should know there is a just punishment for what the defendant did to them, for how he shattered their lives.

These parents were also impacted, the worry, the wonder, sitting around wondering what will become of our daughters because of this or, worse yet, what would our daughters have been without this, thoughts that a parent should never have to endure.

There has to be justice here, Judge, for those girls and their parents. There is a need for the sentence imposed to reflect the seriousness of this offense, to promote respect for the law, to provide just punishment, adequate deterrence and specific deterrence to Mr. Duffy, to protect the public from future crimes of him, and to provide the restitution that's agreed to in this case of $9,000.

1          I ask on behalf of the United States, those girls,

2   and those parents behind me, for a sentence of 25 years and a

3   lifetime of supervised release.  We all feel a personal

4   responsibility to prevent this defendant from doing this ever

5   again to another family.

6          Thank you, Judge.

7          **THE COURT:**  All right.  Thank you.

8          And we will take a short recess.

9   *(Discussion held off record.)*

10         **THE COURT:**  We will take a recess until 3:30.

11  *(A recess was taken.)*

12         **THE COURT:**  We're back on the record in

13  Cause 16-cr-257.

14         And Mr. Duffy and Mr. Riggins, if you would come up

15  to the podium, please.

16         Obviously, this is a tough case; and there's been a

17  lot that we have heard today, and the Court will try to

18  articulate some things in setting out a sentence that is

19  sufficient but not greater than necessary to comply with the

20  purposes set forth in 18 USC 3553(a).

21         And first of all, I would like to thank Mr. Riggins

22  and Ms. Preston for, again, a tough case, tough circumstances,

23  and good advocacy, as well as the folks that submitted

24  statements and/or made statements today, not an easy thing to

25  do, and so the Court appreciates that.

1    Typically, the Court starts off with the advisory

2  sentencing guidelines range.  But because it is a C plea, the

3  sentence here will be a variance, which will be below the

4  guideline range, which is 360 months, which would be 30 years.

5  But the C agreement was between 20 and 25 years, and so it

6  will be a variance from 30 years.

7    But still, in determining where within that 20 to 25

8  years the sentence will fall, the Court does take into account

9  the factors set forth in 3553(a).  And again, many of those

10  were detailed today by both sides articulately and

11  sufficiently; and so the Court has taken those into account

12  and will just mention a few of those, but they were all

13  considered, as well as the victim impact statements and the

14  sentencing memorandums and so on and so forth.

15    So looking at the nature and circumstances of the

16  offense, they can be described in many words to include

17  despicable, depraved, disturbing, horrific, manipulative, and

18  so on.

19    Against that backdrop, of course, was a challenging,

20  less than favorable formative years for the defendant.  But,

21  if anything, it should have given you an idea of how not to

22  treat people and especially young and vulnerable people.

23    As noted, you're off the charts with respect to

24  criminal history.  Whether that's due to acting out or not,

25  that's not for the Court to tell.  But with a criminal history

of VI, arrested 31 times since you were 14, to include serious
things like fraud and forgery, which have, really, nothing to
do with acting out or a challenging childhood, those are,
again, calculating and manipulative types of behaviors such as
we're seeing here.

In addition, however, there's some indication of
mental health challenges, instabilities and such that need to
be taken into account.

The sentence does need to reflect the seriousness of
this offense and to promote respect for the law.  Again, a
criminal history that's off the chart needs to be addressed,
as well as to afford adequate deterrence both specific and to
others who might think that it's okay.

And there are many, many predators that are on
social networks, dating apps, whatever it is, and it is a
constant battle, despite attentive and loving parents.  It is
a hazardous time that we live in; and so those types of
conducts need to be deterred as well as protected from the
public.  And especially, children need to be protected from
these types of crimes, both from this defendant and others.

The Court also considers the need to provide the
defendant with educational, vocational training, medical care,
correctional treatment, again, rehabilitation for mental
health and so on and so forth, and the other factors such as
avoiding unwarranted sentencing disparities and the need to

provide restitution, which will be ordered here and has been

agreed to.

And taking all of those things into account, I will

now state the sentence the Court intends to impose.  Pursuant

to the Sentencing Reform Act of 1984, it is the judgment of

the Court that the defendant, Joshua Shane Duffy, is hereby

committed to the custody of the Bureau of Prisons to be

imprisoned for terms of 300 months on each of Counts 1 and 4,

to be served concurrently.

This sentence, as I noted, is a variance, consistent

with the terms of his binding plea agreement.  It reflects his

personal history and characteristics and protects society from

further crimes of Mr. Duffy.

And due to the order of restitution, which will be

announced shortly, the Court is not ordering a fine.

With respect to restitution, Mr. Duffy shall make

restitution of $9,000 to each of Minor Victims 1 and 2, for a

total of $18,000, which shall be paid immediately.  Any

payment made that is not payment in full shall be divided

proportionately among the victims named.  The payment is to be

made directly to the clerk, U.S. District Court, for

disbursement to the victims.

And Mr. Duffy shall notify the United States

Attorney for this district within 30 days of any change of

mailing or residence address that occurs while any portion of

the restitution remains unpaid.  Any unpaid restitution

balance shall be paid during the term of supervision at a rate

of not less than 10 percent of Mr. Duffy's gross monthly

income.  Mr. Duffy shall notify the probation officer of any

material changes in economic circumstances that might affect

his ability to pay restitution.

The Court finds that Mr. Duffy does not have the

ability to pay interest and waives the interest requirement.

Mr. Duffy shall forfeit all personal property and

other assets used in connection with the instant offenses,

including but not limited to all of his cellular telephones,

digital devices, and storage media.

And I take it that's been done, Ms. Preston?

**MS. PRESTON:**  Yes, Your Honor.

**THE COURT:**  There's nothing further in that regard?

**MS. PRESTON:**  That's correct, Your Honor.

**THE COURT:**  Supervised release is required by

statute; and the Court is imposing a term of a lifetime of

supervised release following any term of imprisonment based on

the nature of the offenses, the personal history and

characteristics of the defendant, and the need to protect the

public, as well as to assist in Mr. Duffy's reentry into the

community.

While on supervised release, Mr. Duffy shall not

commit another federal, state, or local crime; shall cooperate

with the collection of a DNA sample; shall refrain from any

unlawful use of a controlled substance; and shall submit to

one drug test within 15 days of placement on supervised

release and at least two periodic tests thereafter as directed

by the probation officer.

Mr. Duffy shall comply with the requirements of the

Sex Offender Registration Notification Act as directed by the

probation officer.

Mr. Duffy shall also comply with all proposed

conditions of supervised release referenced in the presentence

report, the formal reading of which Mr. Duffy has waived.

It is ordered that Mr. Duffy pay a special

assessment of $100 per count, for a total of $200, which shall

be due immediately.  Payment of the special assessment is to

be made directly to the Clerk of the U.S. District Court.

**MR. RENSHAW:**  We were just seeking some

clarification, Your Honor, as to the life term of supervised

release.

Is that per count?

**THE COURT:**  Yes.  Concurrently, yes.  Lifetime, per

count, concurrently.

As I said, the $200 will be due immediately.

Payment of the special assessment is to be made directly to

the Clerk of the U.S. District Court.

Counsel, do you have any legal objection to the

1  sentence I've just stated I intend to impose or request any

2  further elaboration of my reasons under Section 3553(a) as to

3  the length of imprisonment or as to the length and/or

4  conditions of supervised release?

5          **MS. PRESTON:**  No, Your Honor.

6          **MR. RIGGINS:**  No, Your Honor.

7          **THE COURT:**  All right.  How about, Mr. Riggins, any

8  arguments for sentencing recommendation as to conditions or

9  location of imprisonment?

10         **MR. RIGGINS:**  Yes, Your Honor.  My client would like

11 to be placed at Milan FCI in Michigan.

12         **THE COURT:**  And why is that?

13         **MR. RIGGINS:**  They have the programs there that

14 would help him to get on his feet.  It is a facility, I think,

15 that's primarily geared toward offenders, sex offenders.

16         **THE COURT:**  Okay.

17    *(Discussion held off the record.)*

18         **MR. RIGGINS:**  And it also has UNICOR so he could

19 pay -- start working on paying restitution.

20         **THE COURT:**  Okay.  The Court will make that

21 recommendation.  The Court will also recommend that he be

22 afforded the benefit of any HVAC or mechanical vocational

23 programs; and UNICOR Prison Industries Program; residential,

24 non-residential sex offender treatment; mental and physical

25 health treatment.

1   Knees and teeth, I think, dentures, need some

2   attention.

3       **THE DEFENDANT:**  Yes.

4       **THE COURT:**  As well as, again, we've talked about

5   some potential mental health evaluations and treatment that

6   needs to be done.

7       The Court also recommends the Resolve Program and

8   the BRAVE Program that should benefit the defendant both with

9   respect to rehabilitation; and those programs, one, you may

10  not be available for, you might age out of; but Resolve has to

11  do with rehabilitation from trauma and so on and so forth,

12  that may have been caused by trauma and that kind of thing.

13      Now, Mr. Duffy, you realize that the Court can only

14  make these recommendations, that the Bureau of Prison has the

15  ultimate say in those; but the Court is making those

16  recommendations, all right?

17      **THE DEFENDANT:**  Yes.

18      **THE COURT:**  And, with that, the Court orders the

19  sentence imposed as stated.

20      Mr. Duffy, normally, you would have the right to

21  appeal your sentence.  In this case, you've given up that

22  right as part of your plea agreement.  Such waivers are

23  generally enforceable.  But if you believe your waiver of this

24  right is not valid, you can present that theory to the

25  appellate court.

1  However, if you believe that your guilty pleas were

2  somehow unlawful or involuntary or if there is some other

3  fundamental problem in the proceedings that was not waived by

4  your guilty plea, you can appeal your convictions.

5  Do you understand that?

6  **THE DEFENDANT:**  Yes, sir.

7  **THE COURT:**  Generally, any Notice of Appeal must be

8  filed within 14 days of entry of judgment.  If you cannot

9  afford the filing fee or cannot afford to pay a lawyer to

10  appeal for you, then the Court will appoint a lawyer to

11  represent you on appeal.

12  Also, you may request the Clerk of Court to prepare

13  and file a Notice of Appeal on your behalf.

14  Do you have any questions about your appellate

15  rights, your appellate waiver, or the 14-day time limit for

16  filing your Notice of Appeal?

17  **THE DEFENDANT:**  No, sir.

18  **THE COURT:**  Okay.  Mr. Duffy, I think it's right.  I

19  think that Mr. Riggins said it.  I think that some of your

20  statements on your behalf by your family stated that somewhere

21  along the way, maybe many times along the way, you were failed

22  by people in your life, as well as the system itself, and --

23  but the past doesn't have to define who you are, and you

24  certainly have great potential that's been unrealized.

25  You have people here in support of you that love

1   you, and that's not always the case.  And, so, hopefully,

2   these programs will help you along that road.

3   And the future is in your hands, Mr. Duffy.  You can

4   choose to make this time productive for yourself and to move

5   forward, and the Court has that hope for you.

6   Is there anything further from the government with

7   respect to, for example, Counts 2, 3, and 5?

8   **MS. PRESTON:**  The United States moves to dismiss

9   Counts 2, 3, and 5, Your Honor.

10   **THE COURT:**  All right.  They're dismissed.

11   Anything else?

12   **MS. PRESTON:**  No, Your Honor.

13   **THE COURT:**  Mr. Riggins, anything for the Defendant?

14   **MR. RIGGINS:**  Nothing further.

15   **THE COURT:**  All right.  Mr. Duffy, you're remanded

16   to the custody of the marshal, and I wish you luck.

17   **COURTROOM DEPUTY:**  All rise.

18   *(The proceedings were adjourned at 3:51 p.m.)*

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER

   I, Cathy Jones, hereby certify that the foregoing is a
true and correct transcript from reported proceedings in the
above-entitled matter.



 /s/ Cathy Jones                    May 17, 2019
_____
 CATHY JONES, RDR, FCRR
 Official Court Reporter
 Southern District of Indiana
 Indianapolis Division